Vanessa R. Waldref
United States Attorney
Eastern District of Washington
Tom Hanlon
Richard R. Barker
Assistant United States Attorneys
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

            Plaintiff,

    v.

EDWARD CHARLES ROBINSON, JR..

            Defendant.

Case No.: 1:20-CR-02026-SAB-1

United States' Motion for
Involuntary Psychiatric Medication
to Restore Defendant's
Competency

HEARING:
April 11, 2023
1:30pm

    The United States of America, by and through United States Attorney Vanessa R. Waldref and Assistant United States Attorneys Tom Hanlon and Richard Barker, hereby moves for the involuntary administration of psychiatric medication to restore Defendant's competency pursuant to *Sell v. United States*, 59 U.S. 166 (2003).

## BACKGROUND

    On July 21, 2020, Defendant was indicated on two counts of First Degree Murder in violation of 18 U.S.C. §§ 1111, 1153 and one count of Assault with a Dangerous Weapon in violation of 18 U.S.C. § 113(a)(3), 1153. Defendant stabbed and killed two family members with a knife; a third family member was assaulted

during the unprovoked attack. Both murders and the assault were captured on video. Defendant was arrested on the date of the offense and has remained in custody since that time. *See* ECF No. 13.

Subsequent to his arrest, the Defense moved for a determination of Defendant's competency. ECF No. 31. While the Defense's expert, Dr. Erin Baldwin, initially determined Defendant was competent to stand trial, in a subsequent report, she determined that he was no longer competent. *Id.* The United States sought an independent evaluation by Dr. Cynthia A. Low, which concluded Defendant was not currently competent based on a diagnosis of Delusional Disorder, Persecutory type. Ex. A. Defendant was then referred to FMC Butner, where he has undergone further evaluation and competency restoration under the supervision of Dr. Kristina P. Lloyd. *See* Ex. B-C. Dr. Lloyd agrees that Defendant suffers from a delusional disorder and that he currently is not competent to stand trial. *Id.* Dr. Lloyd further reported that "based upon the data that most individuals with chronic psychotic disorders have some degree of improvement in the symptoms of their illness, . . . a substantial probability exists that Mr. Robinson's competency to stand trial can be restored with appropriate treatment with antipsychotic medicine." *See* Ex. C.

In a proposed treatment plan, which is dated February 14, 2023, Dr. Charles A. Cloutier, M.D., a Staff Psychiatrist at FMC Butner, reported that Defendant's diagnosis "places him in a population of patients that is very likely to respond to antipsychotic medication and reach competency over 70-80% of the time with antipsychotic medication." Ex. D (Proposed Treatment Plan). The treatment plan, which is addressed in further detail herein, proposes a four to eight month regimen, with medications to include risperidone and haloperidol. *Id.* 4. According to the treatment plan, Dr. Cloutier and his team at FMC Butner will "prescribe mediation at the lowest effective dose necessary to safely treat Mr. Robinson's mental illness,

improve functioning, and restore competency." *Id.* at 5. As part of the proposed treatment plan, Dr. Cloutier will work to mitigate any potential side-effects and risks. *Id.*

## ARGUMENT

*Sell v. United States* addresses the involuntary administration of medication to non-dangerous incompetent pretrial detainees.[1] 539 U.S. 166 (2003). In *Sell*, the Supreme Court held that before a district court may authorize the involuntary administration of antipsychotic medication for the purpose of rendering a defendant competent to stand trial, the government must show the following:

1. Important government interests are at stake;

2. Involuntary medication is substantially likely to render the defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial;

3. Involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results; and

4. The administration of antipsychotics is medically appropriate.

*Id.* at 180-81.

The *Sell* factors do not represent a balancing test. It is a set of independent requirements, each of which must be found to be true before the forcible administration of psychotropic drugs may be considered constitutionally permissible. *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 691 (9th Cir. 2010). The

---

[1] Personnel at FMC Butner has indicated that Defendant does not "currently pose[] a substantial risk of dangerousness in the current conditions of his confinement at FMC Butner." Ex. B at 21. The United States respectfully submits that in light of Defendant's offense conduct in this case and his criminal history, Defendant continues to pose a significant danger, especially if he were not in a controlled environment such as FMC Butner or a similar facility.

Ninth Circuit has held that the government has the burden of establishing the facts necessary to allow it to prevail as to each *Sell* factor by clear and convincing evidence. *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010).

**1. Important governmental interests are at stake.**

For there to be important governmental interests at stake, the crime charged must be serious and the government must have an important interest in bringing the accused to trial. *Sell*, 539 U.S. at 180. Here, Defendant's crimes are extremely serious, and the governmental interest is equally compelling.

a.    Defendant's crimes are serious.

Defendant cannot seriously contest that his charges – two counts of First-Degree Murder and one count of Assault with a Dangerous Weapon – are not serious. With respect to the seriousness of a crime, the Ninth Circuit has ruled that "the likely guideline range is the appropriate starting point for the analysis." *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008).[2] Other circuits have similarly explained that "serious" crimes are those that have a right to a jury trial and that "it is appropriate to focus on the maximum penalty authorized by statute in determining if a crime is 'serious' for involuntary medication purposes." *United States v. Evans*, 404 F.3d 227, 237 (4th Cir. 2005); *United States v. Green,* 532 F.3d 538, 548 (6th Cir. 2008) (adopting the approach used in *United States v Evans* that focuses on the statutory maximum penalty).

---

[2] The Ninth Circuit has held that even violations of 18 U.S.C. § 1326 can be serious for purposes of the Court's analysis under *Sell. See, e.g.*, *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008) (holding that at least under some circumstances, a violation of § 1326 may constitute a "serious" crime sufficient to justify involuntary medication under *Sell*); *United States v. Jaramillo-Ayala*, 526 F. Supp. 2d 1094, 1101 (S.D. Cal. 2007) (explaining that a violation of § 1326 is a "serious crime" for purposes of a *Sell* hearing).

United States' Motion to Restore Defendant's Competency – 4

The guideline range and maximum penalty are "not, however, the only factor[s] that should be considered." *Hernandez–Vasquez*, 513 F.3d at 918. The Ninth Circuit has held that an important government interest exists where the crime involves victims or is otherwise a crime of violence. *See, e.g.*, *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (holding that a defendant's threats to choke, rape, and kill government officials and employees was sufficiently serious to satisfy the first *Sell* factor, despite a relatively low guidelines range); *United States v. Loughner*, 672 F.3d 731, 735 (9th Cir. 2012) (mass shooting resulting in the deaths of six people was sufficiently serious under *Sell*). Courts must also look at the "specific facts of the alleged crime as well as the defendant's criminal history" in evaluating the seriousness of a crime. *United States v. Onuoha*, 820 F.3d 1049, 1055 (9th Cir. 2016).

In this case, Defendant his charged with three crimes of violence involving three separate victims – two first-degree murder offenses and an assault with a dangerous weapon. Both his guideline range and the statutory <u>minimum</u> sentence for these crimes is life imprisonment. Defendant also has a violent criminal history, including a conviction for second-degree assault with a dangerous weapon and a pending third-degree assault involving bodily harm and substantial pain. ECF No. 10. If these charges and criminal history were not enough, the specific circumstances of the homicides are horrific. As captured on surveillance video, Defendant slaughtered his two victims – viciously stabbing them numerous times. All of this happened in the presence of a very young child, who was fortunate to escape with their life by crawling out a window. It is difficult to fathom circumstances more violent and serious than Defendant's conduct in this case.

    b.   <u>There are important interests in bringing the accused to trial.</u>

The government's interest in bringing Defendant to trial is sufficiently strong to justify involuntary medication. In examining the government's interests, courts

"must consider [the] facts" and circumstances of each "individual case[]." *Hernandez-Vasquez,* 513 F.3d at 917-18. Here the government's interest in bringing the accused to trial two-fold: (1) ensuring the victims and their families are able to achieve justice for the loss of their loved ones; (2) the government is concerned that in the absence of treatment and without the tools available through medical intervention, Defendant will continue to harbor his delusions and will act on them in ways that may place others at risk and may result in additional victims. Moreover, as discussed in further detail below, other considerations – such as the possibility of civil confinement – do not lessen the government's important interests in bringing Defendant to trail.

*Victims' Interest*: During the pendency of this case, the victims' families have appeared at court hearings and made clear that they want justice for their deceased family members. In this regard, 18 U.S.C. § 3771 provides that "in any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded [certain] rights." 18 U.S.C. § 3771(b). These rights include the right to be protected from the accused, the right to attend public court proceedings, the right to be heard at sentencing, the right to reasonable restitution, and the right to be treated with fairness as well as respect, and the right for the proceedings to move forward without unreasonable delay. The United States respects these rights and submits that such rights entitle the victims and their families the ability to be heard and to seek justice for Defendant's crimes. The administration of antipsychotic medication in this case further serves that significant interest.

*Safety of the community*: By proceeding to trial in this case, "the Government seeks to protect[,] through application of the criminal law[,] the basic human need for security." *Sell*, 539 U.S. at 180. The events underlying the charges in this case demonstrate that Defendant's conduct resulted in the most serious of crimes: The stabbing death of Defendant's family members in the presence of a minor child.

United States' Motion to Restore Defendant's Competency – 6

While the motive for these crimes is not entirely clear, Defendant demonstrates that he is a risk to the community if ever released from custody.

As the record in this case makes clear, Defendant suffers from a delusional disorder whereby he harbors animosity and attributes fault to those close to him – including his family, other inmates, prison personnel, and even his attorneys. As noted below, if left untreated, Defendant's condition will only get worse. In her February 9, 2023 status report, Dr. Lloyd noted that Defendant has "repeatedly expressed paranoid beliefs that inmates and staff sexually propositioned him via their eye contact and body language." Ex. C at 3. He similarly has written letters to FMC Butner staff expressing that the personnel want to "mentally abuse" him based of how they conduct rounds, take or provide his food tray, or look at him. *Id.* at 2. While Defendant has not yet acted on these delusions while in the controlled environment of FMC Butner, Defendant's history indicates that he is more than capable of acting violently and harming those whom he perceives as a potential threat. In fact, Defendant himself offered up a delusional explanation for the stabbing he committed in 2013. Ex. B at 6 ("Mr. Robinson said he was convicted of second degree assault in 2013 because he 'ended up stabbing this guy.' He provided a delusional explanation for the assault.").

Defendant's condition will persist or even get worse if left untreated. Ex. D at 5 ("Without treatment, his psychosis will worsen."). If Defendant's psychosis persists or worsens, it likely is only a matter of time before Defendant again acts on his delusions. Indeed, Defendant acted in an incredibly violent manner when he stabbed and killed two people and attempted to assault a third in April 2020. The underlying facts and circumstances of that stabbing demonstrate the seriousness of the crime charged and the important governmental interests in bringing the charges to a conclusion to ensure Defendant is not released into the community to harm others.

*Additional considerations*: As part of its analysis, the Court must also examine any "[s]pecial circumstances [that] may lessen the importance of [the government's] interest." *Sell*, 539 U.S. at 179-80. "Such special circumstances include the time a defendant has served while awaiting trial and the possibility of future confinement." *Hernandez-Vasquez*, 513 F.3d at 918. In this regard, the Ninth Circuit has clarified that even when a defendant has already served more time in custody than the minimum guideline sentence, this does not necessarily constitute a special circumstance because "general deterrence of the serious crime at issue . . . is also an important consideration." *Onuoha*, 820 F.3d at 1057. That said, an interest could be somewhat lessened if the defendant is a candidate for civil commitment.[3] *Sell*, 539 U.S. at 180.

As set forth in *Onuoha* deterring individuals from viciously stabbing others is an "important consideration" and further establishes an important government interest. Defendant has been in custody in this case since April 2020. While this is not an insignificant period of time, such confinement does not decrease the need for prosecution in this case. Defendant faces multiple life sentences for a double murder. The amount of time he already has spent in custody pales in comparison to the time Defendant would face if convicted of first-degree murder. Notably, the passage of time becomes more relevant in cases where some difficulty arises in trying "a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost." *Sell*, 539 U.S. at 180. There is no

---

[3] The Supreme Court has explained, "[t]he potential for future [civil] confinement affects, but does not totally undermine, the strength of the need for prosecution. At this point in the case, there is no indication that civil commitment will occur and potentially "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Sell*, 539 U.S. at 180. Additionally, civil commitment may ultimately result in Defendant's release from custody, which would be a miscarriage of justice in a double murder case such as this one.

indication here that Defendant's length of confinement would diminish memories or that evidence is at risk of being lost. The entire crime was captured on video, which has been preserved for trial. Accordingly, the risk of relevant evidence being lost is minimal, even if competency restoration were to take several additional months as Dr. Cloutier has opined. *See* Ex. D. Moreover, the time that has passed[4] is directly attributable, at least in part, to Defendant, who refuses to take antipsychotic medicine.

> **2. Involuntary medication is substantially likely to render Defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with Defendant's ability to assist counsel at trial.**

In the second step of the *Sell* test, the government must "make a two-part showing to establish that involuntary medication will significantly further the important governmental interests at stake." *Gillenwater*, 749 F.3d at 1102. To do so, the government must first show that "administration of the drugs is substantially likely to render the defendant competent to stand trial." *Sell*, 539 U.S. at 181, 123 S.Ct. 2174. Second, the government must demonstrate that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Id.* The court's analysis here must focus on what involuntary medication will do, not what it

---

[4] With respect to the passage of time, the Ninth Circuit's decision in *United States v. Steward*, 343 F. App'x 252, 254 (9th Cir. 2009) provides a good comparison. There, the defendant, who was charged with a significantly less serious crime and spent approximately seventeen months in pretrial detention prior to the *Sell* proceedings. *Steward*, 2009 WL 4839529 (C.D. Cal. Dec. 14, 2009). The district court held that the crime was sufficiently serious and that the government's interest in prosecution was sufficiently important. *Id.* On appeal, the Ninth Circuit reasoned, "[T]he amount of time [the defendant] has spent in detention does not lessen the importance of the Government's interest in prosecution." *Steward*, 343 F. App'x at 254 (9th Cir. 2009).

is designed to do. *Ruiz-Gaxiola*, 623 F.3d at 696.

        a.  <u>Likelihood of Competency Restoration</u>

Under the first part of this test, the administration of antipsychotic medication is substantially likely to render Defendant competent to stand trial. In Dr. Cloutier's treatment plan, he recommends an oral administration of risperidone to treat Defendant's Delusional Disorder. Ex. D at 4. If Defendant refuses such medication orally, Dr. Cloutier recommends an intramuscular injection of immediate-acting haloperidol lactate and/or administration of longer-acting haloperidol decanoate. *Id.* Overall, the goal will be to prescribe medication at the lowest effective dose necessary to safely treat Defendant's mental illness, improve functioning, and restore competency.

According to both Dr. Lloyd and Dr. Cloutier, each of whom have significant industry experience, the administration of these medicines is substantially likely to render Defendant competent in this case. As Dr. Lloyd put it, "[A] substantial probability exists that Mr. Robinson's competency to stand trial can be restored with appropriate treatment with anti-psychotic medicine." Ex. B at 21. As Dr. Cloutier similarly explained, "With reasonable medical certainty, it is my clinical opinion that administration of involuntary antipsychotic medication to Mr. Edward Robinson is substantially likely to render him competent to stand trial." Ex. D at 5. These conclusions are not based on conjecture or simply the intended effects or design of such medication. Rather, as Dr. Cloutier put it, "Mr. Robinson's diagnosis of Delusional Disorder places him in a population of patients (psychosis) that is very likely to respond to antipsychotic medication and reach competency over 70-80% of the time with antipsychotic medication." Ex. D at 4. In other words, the proposed medication has proven effective for other inmates with a similar diagnosis to Defendant.

Although "it is unclear what the exact percentage chance of success should be, a court in the Southern District of California has held that a 50 percent probability of success is insufficient" to demonstrate a likelihood that competency can be restored. *United States v. Jaramillo-Ayala*, 526 F. Supp. 2d 1094, 1105 (S.D. Cal. 2007). An "80 percent chance of success," however "appears to be sufficient." *Id; see also United States v. Gomes*, 387 F.3d 157, 161-62 (2d Cir. 2004) (Affirming the district court's finding that treatment was substantially likely to render the defendant with delusional disorder competent to stand trial, and referring to the Bureau of Prison's 70 percent success rate in restoring defendants to competence through treatment with antipsychotic medication).

In the instant case, Dr. Cloutier's medical opinion – i.e., that there is a 70 to 80% chance for success – is  supported by the literature cited in his report. As set forth in the Report's Appendix, "[R]ecent literature review suggests that over a 40 year period (1975-2013), using 51 competency restoration samples and pooling data . . . , the rate of restoration was 81%." *Id.* at D at 7. Significantly, individuals suffering from delusional disorder, like Defendant, have been restored to competency more than 70 percent of the time. *Id.* These statistics are sufficient under prevailing caselaw to satisfy *Sell*. *See e.g.*, *Gillenwater*, 749 F.3d at 1102.

b. Risk of Side Effects

The second consideration under this prong of the *Sell* test is the possibility that the Defendant may experience side effects that will interfere with his ability to assist counsel at trial. *Sell*, 539 U.S. at 180. Dr. Cloutier opined in this regard that based on his training and experience, the side effects from risperidone and similar medication that may be prescribed are minimal and include generally "metabolic risks such as weight gain, elevated glucose, and/or cholesterol." Ex. D at 5. The typical side effects of haloperidol admittedly are pronounced and include extrapyramidal syndrome (EPS), which could involve "mild shaking or tremor, or

brief episodes of muscle tightness or spasm." *Id.* There also is a risk, albeit very slight, that haloperidol could cause cardiac arrest. *Id.* The risks of haloperidol, of course, are mitigated if Defendant does not refuse oral administration of risperidone. *See id.*

To the extent haloperidol becomes necessary, the Ninth Circuit has specifically affirmed a finding that the forced administration of this medicine was "substantially likely to decrease [a defendant's] delusional beliefs" so that he could participate in trial. *See Gillenwater*, 749 F.3d at 1102. In doing so, the Ninth Circuit pointed to evidence in the record that "several recent studies [indicate] . . . more than 70% of persons suffering from delusional disorder saw an improvement in their symptoms when treated with antipsychotic medication." *Id.* at 1103. Notably, other courts to consider haloperidol have concluded that "[t]he possibility of these side effects, while real, is not high." *See, e.g.*, *United States v. Villalobos*, 590 F. Supp. 3d 1234, 1250 (D. Idaho 2022) (approving the use of risperidone and haloperidol to treat a defendant's delusional mental illness in a case charging assault of a federal officer and unlawful possession of a firearm).

To the extent side effects, if any, occur, Dr. Cloutier's proposed treatment plan specifies that, if needed, adjunctive treatments (anticholinergic, benzodiazepines, or mood stabilizers) can be used to manage side effects or improve Defendant's response to treatment. Ex. D at 4. Importantly, for purposes of the *Sell* test, the possible side effects are very unlikely to interfere with the Defendant's competency and his ability to interact with the Court. *See id.* ("[A]ntipsychotic medication to Mr. Edward Robinson is . . . substantially unlikely to interfere with his ability to assist his counsel.").

In sum, involuntary medication is substantially likely to render Defendant competent to stand trial, and substantially unlikely to have side effects that will interfere significantly with Defendant's ability to assist counsel at trial. The Court

should therefore find the second *Sell* factor is met.

**3. Involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results.**

Under the third *Sell* factor, the Court must consider whether "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181. In *Gillenwater*, for example, the Ninth Circuit affirmed the district court's decision that voluntary psychotherapy was not a viable alternative treatment because: (1) the defendant did not realize that he had a mental disorder; and (2) the defendant did not trust anyone, which is a major roadblock to voluntary psychotherapy. 749 F.3d at 1104.

Returning to the case at hand, involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same result. As set forth above, both Dr. Lloyd and Dr. Cloutier have concluded that Defendant is not competent to stand trial, but there is a substantial probability that the Defendant would be restored to competency with treatment of antipsychotic medication. Ex. B at 21; Ex. D at 5. There simply are no less intrusive treatments available that would be nearly as effective. As Dr. Lloyd put it, "less intrusive methods of treatment, such as psychotherapy, are not likely to restore his competence." Ex. B at 21. Dr. Cloutier similarly has concluded, "Less intrusive treatments are very unlikely to achieve the same results as anti-psychotic medication." Ex. D at 5. Indeed, as noted further in the Appendix to Dr. Cloutier's report,

> There is no convincing evidence in the published literature that patients with chronic schizophrenia or related psychotic disorders significantly respond to psychotherapy alone compared to the response to treatment with antipsychotic medication augmented with psychosocial interventions. Most proponents of cognitive behaviorally oriented

psychotherapy for schizophrenia acknowledge the biological basis of the disorder and actively promote medication compliance.

Ex. D at 8 (emphasis added).

Significantly, like in *Gillenwater*, Defendant does not appear to believe that he has a disease, and he refused to accept treatment of any type. Ex. D at 2. This makes him unlikely and unable to effectively engage and benefit from psychotherapy without medical intervention. *See Gillenwater*, 749 F.3d at 1104. In this regard, "Multiple randomized clinical trials and follow-up studies conducted in the 1960s and 1970s found that psychotherapy alone was not sufficient treatment" for mental disorders similar to Defendant's delusional disorder. Ex. D at 8. Rather, the majority of those patients "treated with psychotherapy alone remained seriously and chronically ill." *Id.*

Defendant has stressed to his treatment providers that he does not wish to be medicated, claiming that he is concerned it will make him sleepy and/or interfere with his ability to exercise. According to defendant, "he did not want to take medication because it would cause him to oversleep and interfere with his activities, e.g., exercising, reading." Ex. B. at 12.  In his own words, Defendant further elaborated:

> I don't want medication. Most inmates here are either gay or bisexual, and I could end up getting raped. The medicine could cause drowsiness or cause me to sleep. It could interfere with how much I exercise – it could make breathing hard for me. It's just what medicine do. I don't like medicine, because I work out a lot during the day, and I don't want it to interfere with how much I exercise.

Ex. B at 9-10 (typographical errors in original). These concerns, however, appear to be premised on Defendant's delusional beliefs that he is at risk of being sexually assaulted by other inmates or the guards at FMC Butner, even though he is in a secure housing unit. Ex. B at 11. To the extent Defendant understandably is

United States' Motion to Restore Defendant's Competency – 14

concerned about side-effects, FMC Butner has made clear that such "side effects can be detected early and addressed before they become serious." Ex. D at 6.

In the event that the Defense seeks a court order, backed by contempt power, requiring Defendant to accept medication – i.e., before considering the forced administration of antipsychotic medication – a court order is almost certain to delay the proceedings and unlikely to be an effective alternative to the forced administration of medicine. While a court order would be less intrusive, it likely would prove fruitless. The Appendix to Dr. Cloutier's treatment plan specifies that contempt orders had been largely ineffective. Ex. D at 15. Of the three contempt orders issued to prisoners at FMC Butner, only one was met with success. *Id.* The refusal of the other two prisoners to follow the contempt orders led to significant delays in the court proceedings. *Id.* As Defendant has now been deemed incompetent to stand trial by four "separate physicians, and suffers from a delusory disorder that severely distorts his view of the world around him, it is unlikely that he would understand – or comply with – a contempt order from the Court." *See Villalobos*, 590 F. Supp. 3d at 1250.

In sum, because there is no less intrusive alternative treatment available to restore Defendant competency, involuntary medication is necessary for the government to prosecute this case. The third *Sell* Factor is therefore met.

**4. The administration of medicine is medically appropriate.**

The fourth *Sell* factor requires the proposed treatment plan to be "medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. When analyzing this factor, "courts must rely on the testimony of medical experts in evaluating the constitutionality of involuntary medication." *Onuoha*, 820 F.3d at 1060.

Dr. Cloutier has indicated and is expected to further testify that the Defendant's psychotic disorder causes suffering and that his disorder is treatable

with medication. *See* Ex. D. Dr. Cloutier is further expected to testify that the administration of the medication proposed is medically appropriate without regard to the charges pending against the Defendant. Ex. D at 5. According to Dr. Cloutier, a specific treatment plan utilizing risperidone and possibly haloperidol is expected to not only improve Defendant's competency, but also decrease his symptoms of mental illness and increase Defendant's functioning. *Id*. Dr. Cloutier also has indicated that steps will be taken to administer gradually an increased dosage of medication over time to mitigate any possible risks. Ex. D at 5. On this record, the administration of drugs is medically appropriate in this case.

## CONCLUSION

Defendant suffers from an illness that will not cease without treatment. He has committed an incredibly serious crime, and the government has an important interest in prosecution. Due to Defendant's belief that he does not have an illness, and given that he is not amenable to any treatment, involuntary medication is necessary to further the government's interest in prosecution. There is no less intrusive option that would achieve substantially the same results. Additionally, the administration of drugs is medically appropriate. The Court should therefore order the involuntary medication of Defendant to restore him to competence.

DATED this 27th day of February, 2023.

Vanessa R. Waldref
United States Attorney

*s/Richard R. Barker*
Richard R. Barker
Tom Hanlon
Assistant United States Attorneys

1
2
3

**CERTIFICATE OF SERVICE**

4    I hereby certify that on February 27, 2023, I electronically filed the
5    foregoing with the Clerk of the Court using the CM/ECF System which will send
6    notification of such filing to counsel of record.
7
8                             *s/ Richard R. Barker*
9                             Richard Barker
                             Assistant United States Attorney
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States' Motion to Restore Defendant's Competency – 17